KEITH M. KNOWLTON, L.L.C.
9920 S. Rural Road, Suite 108
PMB# 132
Tempe, Arizona 85284-4100
(480) 755-1777
FAX (480) 471-8956
Attorney for Plaintiff
**Keith M. Knowlton - SBN 011565**
keithknowlton@msn.com

FILED _____ LODGED
✓ RECEIVED _____ COPY

AUG 1 8 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ P DEPUTY

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Leanna Smith, an individual, | ) |
| Plaintiff, | ) Case No. 2:12-cv-00905-ROS |
| vs. | ) |
| Scott Elton M.D. and Spouse Elton, husband and wife; Banner Health System, a foreign nonprofit corporation doing business in Arizona as Banner Desert Medical Center; Tammy Hamilton-Macalpine and Spouse Hamilton-Macalpine, husband and wife; Bonnie Brown and Spouse Brown, husband and wife;  Amanda Torres And Spouse Torres, husband and wife | ) AMENDED COMPLAINT ) ) (42 U.S.C. § 1983 Interference with Parental ) Rights, Retaliation and Civil Conspiracy) ) ) ) |
| Defendants. | ) |

Plaintiff, Leanna Smith, as and for her complaint against Defendants alleges as follows:

**JURISDICTIONAL ALLEGATIONS**

1.      Plaintiff Leanna Smith ("Smith")  at all times mentioned herein resided in Maricopa County, Arizona.

2.      At all relevant times applicable to this Complaint, CR was a minor child of Leanna Smith and is a fictitious name to protect her identity.

3.      Defendant Scott Elton ("Elton") is licensed to practice medicine in the State of Arizona and is employed as a Neurosurgeon by Banner Desert Medical

Center.  Elton caused events to occur in Maricopa County Arizona out of which this complaint arose.

4.     Defendant Banner Health System is a foreign nonprofit corporation doing business in Arizona as Banner Desert Medical Center ("Banner Health").    Banner Health, through its employees, caused events to occur in the State of Arizona out of which this Complaint arose.

5.     Defendants Arizona Child Protective Services ("CPS") Case Worker Tammy Hamilton-MacAlpine ("MacAlpine"), CPS Case Manager, Bonnie Brown ("Brown") and CPS Supervisor investigator Amanda Torres, ("Torres"), at all time relevant to this Complaint are all employees of the Arizona Department of Economic Security ("DES") and/or CPS and in the course and scope of their employment caused events to occur in Maricopa County, Arizona out of which this complaint arose (referred to collectively as "CPS Defendants").

6.     Each and every individual Defendant is being sued for their conduct and not because of the position they hold.  At all times mentioned herein, each individual Defendant was acting within the course and scope of said agency and employment.

7.      Upon information and belief the above individual defendants are married and the names of their husbands and/or wives are unknown and therefore listed as Spouse.  Upon information and belief the alleged acts of the above individual Defendants  were done for the benefit of the marital community and therefore Plaintiff will amend the Complaint to include the names of any of the spouses prior to trial of this matter.  This allegations only applies to pendent state tort claims and not to claims raised under 42 U.S.C. § 1983.

8.     Defendant Banner Health is responsible for the acts and/or omissions of its agents and/or employees under doctrines of respondeat superior, agency, and joint venture on the State Tort claims.

9.     A JURY TRIAL IS REQUESTED.

2

**SUMMARY**

10.    CR, Plaintiff's minor child, was taken from Plaintiff by CPS and dependency had been found by the Juvenile Court.  The United States District Court Case No. CV2010-092354 involved allegations regarding the initial taking of CR by CPS around September 3, of 2008.

11.    The plan approved by the Juvenile Court was for reunification of CR with Plaintiff.

12.    The Juvenile Court signed the order reuniting Plaintiff with CR and giving Plaintiff physical custody of CR.  However, just after that order was signed, Elton accused Plaintiff of using a needle to put air in CR's shunt and brain ventricle and filed a complaint, through Banner, to CPS making such an allegation.

13.    CPS immediately asked the Juvenile Court to vacate the reunification order.

14.    DES on September 27, 2010, pursued termination of Plaintiff's parental rights in CR.  The Petition for Termination went to trial and Dr. Elton was listed as a witness but did not testify.  The State of Arizona abandoned his allegations as a basis for termination.  After trial, the Juvenile Court on January  24, 2012 dismissed the petition for termination and dismissed the petition for dependency regarding CR.

15.    Plaintiff lost reunification with CR from November of 2009 to January of 2012 when the Juvenile Court ruled in Plaintiff's favor.

**STATUTE OF LIMITATIONS**

16.    Plaintiff filed a Motion to Amend Complaint with the United States District Court in Case No. CV2010-092354 on October 28, 2011.  This was within two years of the date of the incident set forth herein which at the earliest was November 24, 2009.

17.    The District Court Judge denied the Motion on January 17, 2012 and stated that Plaintiff "can assert those claims in new litigation."

18.    Pursuant to 28 U.S.C. § 1367(d) Plaintiff had thirty (30) days from dismissal to file those claims or such longer time as is provided under state law. A.R.S. §12-504(A) provides for the refilling of dismissed claims within six (6) months of dismissal.

19.    This case was filed within six months of the order denying the Motion to Amend Complaint to include these new claims that are not contained in CV2010-092354.

## FACTUAL ALLEGATIONS

20.    Plaintiff incorporates all the above paragraphs as though fully set forth herein.

21.    CR was placed in Arizona Child Protective Services ("CPS") custody on 9/3/08.

22.    The Juvenile Court granted the Department of Economic Securities ("DES") Dependency Petition and the plan contained in the Juvenile Court's order was reunification of CR with Plaintiff.

23.    On September 18, 2009, Plaintiff sent a Notice of Claim to the CPS regarding allegations that CPS wrongfully took CR. Upon information and belief, Dr. Elton was informed of this and aware that Smith was threatening litigation for the wrongful taking of her child on September 3, 2008.

24.    On November 23, 2009, an Order was entered by the Juvenile Court for a Change Of Physical Custody returning CR to Smith and her family. The Court approved reunification and return of CR to Smith's custody and control.

25.    CR was scheduled to spend the Thanksgiving four-day holiday weekend at home with her family. CR was excited about this.

26.    CR was taken to Smith's home for her Tuesday unsupervised visit and Smith would pick CR up after school on Wednesday for the Thanksgiving holiday.

4

27.    On 11/24/09 CR came to visit Smith at 4:00 p.m. for her scheduled unsupervised visit at home. At this visit, CR told her mother that she had a severe headache and that she hit her shunt on a hook at school and that the shunt was lose. The reunification team arrived at 4:32pm. Jewish Family Services sent Venus from the reunification team.  CR informed "Venus" of her situation and Smith called the Foster Mother and informed her as well.  Smith requested CR be taken to Dr. Elton because she did not want to have a shunt problem over the Thanksgiving Holiday weekend.

28.    The Foster Mother took CR to the emergency room to have the shunt checked.  Smith met the Foster Mother at Banner ER at 8:00pm on 11/24/09. A CT scan was performed which showed there was a few bubbles of air in the shunt reservoir of the shunt and one small bubble of air in the ventricle.

29.    Upon information and belief, the Foster Mother reported that Dr. Elton was angry and acted angry.

30.    Dr. Elton stated that the only way air could get into the shunt, especially in the ventricle, would be to mechanically inject the shunt with air.  He also saw two suspicious red areas over the reservoir that he could not positively identify as needle mark.  Dr. Elton stated that the air in the shunt could not have come from simply striking the shunt since there were no CT scans showing any air in the system in the prior months.  Dr. Elton confronted CR regarding her story when he talked to her at the hospital.

31.    Dr. Elton felt the shunt was still working but wanted CR to come back in one week to check the shunt.

32.    Dr. Elton requested the matter be investigated and referred the matter to social services to make the report.

33.     On 11/25/09 by Dr Scott Elton conducted a physical examination.  He states: " I used loupes and inspected the scar. There are 2 small areas over the dome that are slightly erythematous and punctuate, but no lacerations or contusions are

present." " Her shunt has air in the valve , but more importantly there is intraventricular air. This can only be introduced mechanically.  It raises concern over the injection into the shunt." " It raises concern over injection into the shunt. CPS should be notified and this event investigated."

34.    On 11/25/09, Banner made a hotline child abuse report to CPS.  The report stated that CR was with Smith and was returned to Foster Mother with a severe headache.  Foster Mother took CR to the emergency room.  "Per neurosurgeon's note: pt has a "functional VP Shunt, Air in the ventricle/inside shunt.  The only way to get intrashunt air, especially into the ventricle is to inject the shunt.  There are 2 suspicious areas over the shunt reservoir although I cannot definitively identify them as needle marks.  This could not occur from simply striking the hook over the shunt, especially since there has been no intraventricular or inshunt air going back many months."

35.    On the same date, the Foster Mother reported to Allen Kasuma, CPS Assistant Program Manager that Dr. Elton, using a magnifying glass, saw "there were 'two holes' where someone could have injected air into the shunt."

36.    There was no danger to CR from the air in the shunt.  The only danger would occur if the air caused the shunt to fail and stop draining fluid from the brain.  This did not happen.

37.    Dr. Pyburn, the psychologist responsible for reunification, found that by 11/25/09, her concerns regarding the relationship between CR and Plaintiff (need for disassociation) had been remedied and recommended reunification between CR and Smith.  Disassociation had taken place such that CR thought for herself separately from her mother and could understand and participate independently in medical treatment.  Dr. Pyburn document that there was no longer any concern for the safety of CR in Smiths home regarding medical care and treatment.

38.     The CPS Defendants, authorized by Bonnie Brown, CPS Unit Supervisor, to terminate all unsupervised contact between CR and Smith and stopped the reunification pending an investigation into Dr. Elton's air in the shunt allegation.

39.     The matter was referred to Detective Page at the Tempe Police Department to investigate the air in the shunt allegation.

40.     On 11/25/09 at 1:10 pm, CR's case manager, Tammy Hamilton-MacAlpine, called Smith and notified her that CPS was suspending unsupervised visits until further notice. She stated this is due to Dr. Elton's concern that the Pin Point Punctures in the shunt do not match up with the report of hitting her head related to Dr. Elton by CR.

41.     On 11/25/09 at 2:30PM, Bonnie Brown CPS Supervisor to Tammy Hamilton-MacAlpine called Attorney General Sean Campbell and reported CPS had stopped unsupervised contact and requested that Change Of Physical Custody be rescinded.

42.     On 11/25/09, Amira Elahmadiyyah (social worker at Banner) spoke by phone to CPS Supervisor Bonnie Brown and CPS Investigator Tammy Hamilton-MacAlpine.  In her report she stated: "Per CPS, report received and will be investigated as a new report. Per CPS, pt is to be discharged to current Foster Mother. Mother is not to be with pt unsupervised and unsupervised visits are canceled until further notice. CPS requesting that mother leave prior to pt's discharge and be escorted by security. CPS to follow for new investigation.  PD will be contacted by CPS. Forensics will be consulted by CPS."

43.     On 12/2/09 Bonnie Brown, CPS Supervisor to Tammy Hamilton MacAlpine, CR, CPS Investigator Amanda Torrez and Foster Parents meet with Dr. Scott Elton.  It was reported by CPS that Dr Elton advised that CR would need to be admitted to the ER because the Shunt was failing.  He stated that he is considering sending the shunt to be examined to see what caused the failure.

44.    On 12/2/09 Tammy Hamilton-MacAlpine provided an update of the CPS investigation and stated it was alleged there were "pinpoint punctures in the tubing of the shunt."

45.    CR at no time stated that Smith did anything to her shunt.  However, on or about May 25, 2011, CR change her story about how the shunt was damaged and how air got in the shunt.  CR informed her Foster Mother that "she had caused her shunt to fail both times." "She caused her shunt to fail by beating her shunt every night with a game boy.  She caused it to fail when she received the meningitis and she caused it to fail in November."

46.    On 12/2/09, a CT Scan was performed that showed that the air was gone but indicated the shunt was failing.  The Ventricle had become enlarged.

47.    On 12/02/09 CPS Supervisor Brown's states what information she received from the treating doctors at Banner Desert Medical Center.  She explained that CR went for a CT Scan in August which was normal and she now went for a CT Scan when she was taken into the hospital on 11/25/09 and there was now swelling on the brain.  **She said that the shunt was adjusted by the doctors so they are hoping that the fluid will help push the air bubbles out from the pinholes.**  She said that the doctors also think the shunt will fail but they won't give a definitive answer as to why that would occur.  If the shunt fails then CR will go back into the hospital to have it replaced.

48.    Bonnie then explained that they are at the point to where they were reunifying CR with her mother and she was going to be returned to her mother's care and "no they aren't able to do that."  She further said that Leanna is suing the hospital for $4,000,000 saying that they have given improper care to CR.

49.    Bonnie said that in April of 2009, CR had a medical shunt failure which the doctors could explain "**but the pinholes in this shunt can't be explained.**"

50.     On 12/3/09 Surgery was performed and the shunt replaced.  Dr. Elton stated that it had nothing to do with the air in the shunt and the ventricle tubing had become clogged.

51.     Dr. Elton had the shunt that was removed taken by the hospital for an examination.  He informed Smith, CPS and Detective Page that he would have the Ventricular Peritoneal Shunt sent to Forensics to be examined.

52.     On 12/4/09 Smith received a call from CPS investigator Amanda Torres Supervisor, David Fink stating that they had suspended all supervised visitation  and Smith's contact with CR. CPS Supervisor David Fink stated they had a Team Decision Meeting and have decided that because of police involvement all contact will be stopped.  David Fink stated that a Psychologist from Tempe will be consulted to figure out what visitation will look like.

53.     On 12/16/09 at approx 0850 hours Detective Page from the Tempe Police Department met with Dr. Scott Elton and his Attorney Brett Johnson. Detective Page said to Dr. Elton " I told him that I was told that he found some pinholes in the shunt and he said that wasn't accurate but he did notice two small red marks over the shunt and he doesn't know what that means."

54.     " I asked him is Smith suing the hospital and he said he hasn't heard that. He said that he had heard she is CPS, the federal government and the state for $4,000,000 but they haven't heard anything about him or the hospital being sued.  His attorney then stated that they hadn't been served with anything."

55.     Dr. Elton then informed Officer Page that he was not concerned about the air in the shunt but could not explain how the air got into the ventricle.  He stated the shunt was sent for an examination.  Detective Page requested the information obtained by that examination.

56.     On 12/21/09, Detective Page told Amanda Torres at CPS "I do not have a crime that can be established at this time and that I am waiting for the results of the

shunt examination." Amanda Torres responded that CPS would continue the investigation from there. Upon information and belief, Torres was the CPS investigator tasked with investigation of the air in the shunt incident.

57.    On 1/13/2010 Detective Page documented that she was informed by counsel for Dr. Elton, Brett Johnson, that there wasn't going to be any additional testing done on the Shunt. Detective Page was informed "there is a liability issue being the shunt technically belongs to the patient in addition to the eight thousand dollars to have the exam done."

58.    Detective Page was further informed "that the examiner told them that the shunt would most likely be damaged from the examination of it and therefore we won't be able to do the examination." Page was informed the shunts Chain of Custody had been maintained and the shunt was at Banner.

59.    On 1/19/10, Detective Page picked up the shunt, put it into evidence. At that time she closed the case "as no crime can be established."

60.    On 2/8/2010 the question was raised with Tammy Hamilton-Mac Alpine, in light of the recent events, how the decision was made to determining if CR should be reunified with mother. It was reported that the decision to reunify was based on the advice from Dr. Pyburn that it was safe to return CR to the home and that there are case notes in CHILDS to support this decision..

61.    On 3/8/10, Dr. Coffman, who originally had investigated the initial allegations against Plaintiff for Detective Page and CPS, prepared an Addendum to her letter to Detective Page. She was asked by the Attorney General's Office to review the case in light of Dr. Elton's allegations and make a recommendation. She reviewed the CPS and police records and spoke by telephone with Dr. Elton and with Tammy MacAlpine.

62.    Dr. Elton told Dr. Coffman that there were limited ways air can be introduced into a shunt. One is during shunt placement and another is when the shunt

valve is not working. The third is instillation of air into the shunt. Elton told her that he did not feel the first two applied and that direct injection of air into the shunt remained a possibility. He stated CR's story did not explain it as well (hitting her head on a hook at school).

63.    Dr. Coffman stated: "Although it is not possible to say with certainty that air was injected into the shunt and, if so, by whom, given the history of [CR]'s medical course when she was in the care and custody of her mother, I would be very concerned about the possibility that this is inflicted injury."

64.    Dr. Coffman stated she was "very concerned about safety if [CR was] returned to her Mother's care" and she also recommended a full medical and psychological evaluation of JS.

65.    On 3/8/2010, Dr. Pyburn was confronted regarding why she agreed to reunification. She was reportedly provided medical reports from 2003 and challenged with the argument that those records showed Munchausen Syndrome by Proxy ("MSBP"). Pyburn stated in her letter "No child can protect themselves from medical abuse, regardless of their individual strength. Nor should any child have to. If the medical allegations are even partially true, then [CR] is no exception and would be unable to protect herself from harm." She further stated that CR and mother had made significant gains differentiating themselves and reducing enmeshment. Dr. Pyburn stated she did not know the truth and that out of an abundance of caution she should err to protect the child and recommended continued out of home placement with supervised visits until CR turned 18.

66.    Dr. Elton later on March 22, 2010, in a tape recorded interview stated he did not have evidence indicating a needle was used to push air into the shunt and that he has no opinion how the air got into the shunt.

67.    DES and its entity CPS sought termination of Plaintiff's parental rights and custody. The matter came to trial before the Juvenile Court and the Juvenile Court

on January 24, 2012 denied the petition to terminate Smith's parental rights in CR and the Court dismissed the dependency action.

68.     Dr. Newberger, Plaintiff's pediatric child abuse expert testified at the Juvenile Court trial that the same retrograde process, intestinal bacteria going up the shunt into the brain that caused Plaintiff's meningitis in April of 2009 could have resulted in the introduction of gas into the shunt.

69.     Dr. Newberger testified that there was no evidence that air had been mechanically put into that shunt.

## COUNT ONE
### (42 U.S.C. § 1983 RETALIATION AND INTERFERRENCE WITH CONSTITUTIONAL RIGHT OF PARENTAL CUSTODY)

162.     The allegations set forth above are fully incorporated herein by this reference.

163.     Upon Information and belief, Defendants Brown, MacAlpine and Torres are employees of the State of Arizona, DES and CPS.

164.     Upon information and belief, Defendant Elton conspired with and agreed to act jointly with Defendants Brown, MacAlpine and Torres ("CPS Defendants") (collectively the "Retaliation Defendants") to terminate reunification of Plaintiff with CR, return of custody of CR to Smith and to provide false allegations against Plaintiff that she has MSBP (by intentionally using a needle to push air into the shunt).

165.     Dr. Elton, after making the initial complaint to CPS, met with Brown, MacAlpine and Torres in his office regarding his allegations. Dr. Elton did not withdraw his allegations or opinions until after the air in the shunt allegations had been used  by the CPS Defendants to influence Dr. Pyburn to revoke her recommendation of reunification.  The CPS Defendants moved forward after this meeting with allegations that Plaintiff had MSBP because she put air into Plaintiff's shunt.

166.    Upon information and belief, the Retaliation Defendants did so intentionally and with malice because Plaintiff continued to threaten litigation against the medical doctors, filed a Notice of Claim on Defendants Brown, MacAlpine and Torres, and later, filed a Complaint in the United States District Court of Arizona on March 22, 2012.

167.    In committing the above referenced actions and/or omissions, the Retaliation Defendants, and each of them, acted under color of state law, and engaged in conduct that was the proximate cause of a violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States of America, including but not limited to retaliating against Plaintiffs for asserting their constitutional right to seek redress of grievances from government and for exercising their First amendment right to defend themselves from the false allegations raised by Defendants and knowingly taking action to interfere with parental custody, thereby violating Plaintiff's civil rights under 42 U.S.C. § 1983.

168.    Defendants' actions were deliberately indifferent to Plaintiffs constitutional right as a parent.  Defendants knew that Plaintiff was not a risk to her daughter and that it was not reasonable to assert she had put air in the shunt yet they vigorously used that allegation to stop reunification of CR with Plaintiff.

169.    The acts set forth in this Complaint by all Defendants, individually or together, were extreme and outrageous, designed to cause emotional distress and did cause emotional distress to Plaintiffs.

170.    Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiffs for the above described violations of Plaintiffs Constitutional rights.  Plaintiffs are entitled to all rights, remedies, in law or in equity, available to them under 42 U.S.C. § 1983. Plaintiffs have suffered the loss of custody and time with CR and suffered humiliation and degradation because of Defendants' Unconstitutional acts.

171.   Plaintiffs are entitled to recover their reasonable costs and attorney's fees under 42 U.S.C. § 1983.

172.   Plaintiffs are entitled to punitive damages.

**COUNT TWO**
**(CIVIL CONSPIRACY AND FRAUD)**

173.   Plaintiff incorporated herein all proceedings paragraphs of the Complaint.

174.   The Retaliation Defendants conspired together and agreed to work together to end reunification of Plaintiff's custody rights in CR, including but not limited to bringing allegations of medical child abuse and MSBP against Plaintiff.

175.   The above actions constitute a scheme or artifice to defraud Plaintiff of custody of CR.

176.   Upon information and belief, Plaintiffs parental interest in CR and JS constitutes a property interest that Defendants knowingly and intentionally schemed to deprive Plaintiffs of by manufacturing false allegations that Mother had mechanically put air into CR's shunt.

177.   As a result of the Retaliation Defendants acts, Smith was not reunified with CR.  Plaintiff was forced to hire an expert to defend herself in the Juvenile Court from the air in the shunt and MSBP allegation and Plaintiff has incurred expenses over $50,000.00. in retaining and having experts appear for trial before the Juvenile Court on the issue.

178.   Plaintiffs are entitled to punitive damages.

179.   Plaintiff has suffered damages, including but not limited to loss of custody of CR, emotional distress, injury to reputation and humiliation all in an amount to be proven at trial.

## COUNT THREE
### (INTENTIONAL INTERFERENCE WITH PARENTAL CUSTODY)

180.   The allegations set forth above are fully incorporated herein by this reference.

181.   Defendants and each of them conspired and agreed together to deprive Plaintiff of her custody and control of CR by stopping reunification what would have provided Plaintiff with physical custody of CR.  Defendants agreed to and did provide false information to the Juvenile Court to justify termination of the reunification order. Defendants intentionally interfered with and provided false and misleading information to the Court and to Dr. Pyburn.

182.   Defendants and each of them acted with malice in making the report to Child Protective Services.

183.   As a result of defendants actions alleged above, Plaintiff suffered damages including but not limited to alienation of affection, loss of companionship and custody of her daughter and  endured mental and emotional distress, all in an amount to be determined at trial.

184.   Defendants' actions have proximately caused Plaintiff to loss re-unification and physical custody of CR.

185.   Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff prays that judgment be entered in her favor and against Defendants and each of them as follows:

1. For compensatory and consequential damages;

2. For attorneys' fees incurred in this matter;

3. For punitive damages; and

4. To grant such other and further relief as the Court feels is just under the circumstances.

DATED this 14th day of August, 2012.

KEITH M. KNOWLTON, L.L.C.

By: _____
Keith M. Knowlton
Attorney for Plaintiff